UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
LUCIA LANZILLO,

                        Plaintiff,                  **REPORT AND RECOMMENDATION**

        -against-                 CV 19-1068 (JMA) (ARL)

NANCY BERRYHILL,
Acting Commissioner of Social Security,

                        Defendant.
-----------------------------------------------------------------X

**LINDSAY, Magistrate Judge:**

The plaintiff, Lucia Lanzillo ("Lanzillo"), commenced this action pursuant to the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of the final decision of the defendant, Nancy Berryhill ("Berryhill" or "Commissioner"), the Acting Commissioner of the Social Security Administration ("SSA") until June 17, 2019, which denied her application for disability insurance benefits. Currently before the undersigned, on referral from District Judge Azrack, are the parties' cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, the undersigned respectfully recommends that (1) Lanzillo's motion for judgment on the pleadings be denied (2) Berryhill's cross-motion for judgment on the pleadings be denied and (3) the case be remanded to the Commissioner for further proceedings consistent with this Report and Recommendation.

## BACKGROUND

### I.     Procedural History

On March 23, 2016, Lanzillo, who is a resident of Jefferson Station, New York, filed an application for disability insurance benefits pursuant to §§ 216(i) and 223 of the Act, 42 U.S.C. 416(i) and 423, alleging that she became disabled on May 5, 2015, due to herniated discs, a right

shoulder impingement, degenerative disc disease, a synovial cyst of lumbar facet joint and anxiety.  Compl. ¶¶ 1, 5; Transcript of the Record of Proceedings ("Tr.") at 210-11, 246.  On June 8, 2016, Lanzillo's claim for Social Security disability benefits was denied, and she immediately requested a hearing before an Administrative Law Judge ("ALJ").  Tr. 82-87, 90.  On June 1, 2018, almost two years later, Lanzillo appeared with her attorney at a video hearing before ALJ Theodore Kim and presented testimony.  *Id*. 31-70.  Suman Srinivasan, a vocational expert, also appeared.  *Id*. 31, 58-68; 275-76.  On July 20, 2018, the ALJ issued his decision finding that Lanzillo was not disabled.  *Id*. 10-30.  Shortly thereafter, Lanzillo sought review of the ALJ's decision by the Appeals Council.  *Id*. 187-205.  On February 15, 2019, the Appeals Council denied Lanzillo's request for review, finding that there was no basis for changing the ALJ's decision.  *Id*. 1-6.  As a result, the ALJ's decision became the final decision of the Commissioner.

On February 22, 2019, Lanzillo commenced the instant action.  On November 5, 2019, Lanzillo moved for judgment on the pleadings.  ECF No. 21.  At the same time, Lanzillo submitted a letter to Judge Azrack requesting that her motion be deemed unopposed "due to the habitual dilatory conduct of defense counsel." Specifically, Lanzillo complained that the defendant had refused to file the Administrative Record.  *Id.*  In response, on August 21, 2019, Judge Azrack directed the defendant to serve a response within 60 days of service.  However, the defendant then sought several extensions and Judge Azrack amended the briefing schedule to permit the defendant to file and serve Berryhill's combined response by January 13, 2020.  Judge Azrack also directed the defendant to serve and file a reply and the administrative record by February 27, 2020.  *See* Order dated 1/6/2020.

Approximately one month later, the defendant sought additional time to file her

combined response and that request was also granted by the Court, but not until June 10, 2020.

Complaining of the delay, Lanzillo, then sought to strike any submission by the defendant.  In

response to the motion to strike and the defendant's response, Judge Azrack, once again,

extended the time for the defendant to file and serve a combined response to January 4, 2021.

*See* Order dated 11/27/2020.  In that same order, she directed Lanzillo to file and serve a reply by

February 4, 2021.  However, shortly thereafter, the Court learned that the defendant had already

served the plaintiff with her combined response on January 8, 2020.  Accordingly, the Court

modified the briefing schedule and established February 4, 2021 as the date by which the

briefing would be considered closed.  Three days later, the cross motions were referred to the

undersigned.[1]

## II.    Factual Background

### A.    Non-Medical Evidence

Lanzillo was born in 1979.  Tr. 37.  She has an associate's degree from Briar Cliff

College.  *Id.*  In 1997, Lanzillo began working at Taco Bell in Riverhead and became a manager

in 2003.  *Id.* 37-40.  Lanzillo's duties included keeping track of stock, training and scheduling

employees, cooking and managing the store.  *Id.* 38.  At work, she was required to lift items that

weighed as much as 100 pounds.  *Id.* 38-39.  In 2011, Lanzillo alleges that she injured her back

and wrist when she tried to catch boxes that were falling off of a shelf at work.  *Id.* 40, 602.  She

stopped working in May 2015, when she was required to have surgery for her back.  *Id.*  Lanzillo

also claims to suffer from a shoulder problem.  *Id.* 44-45.  According to the record, in January

2015, Lanzillo fractured her humerus and tore her rotator cuff.  *Id.* 44.  She had corrective

---

[1] The undersigned notes that, as of the date of this report, the defendant's motion for extension (ECF No. 29) and the plaintiff's motion to strike (ECF No. 31) appear as open motions on the docket sheet.  As noted above, the revised scheduling orders entered by Judge Azrack address those motions.  Accordingly, the undersigned respectfully recommends that they now be denied as moot.

surgery for her shoulder in September 2015. *Id.* 45. Moreover, Lanzillo alleges that she has a problem with her bicep tendon, that is, "she can't reach or maneuver it." *Id.* 49. Lanzillo further states she has problems using her hands, specifically, "her left hand is numb most of the day" and "her right hand is numb in the morning." *Id.* 50. Finally, Lanzillo claims she suffers from hip pain from bursitis. *Id.* 56.

According to the function report submitted by Lanzillo in connection with her disability claim, Lanzillo lives with her brother and a friend. *Id.* 37. Lanzillo indicated that she is raising her friend's seven-year-old girl and is seeking legal guardianship. *Id.* 223-24. Although she says that the girl's mother does most of the meal preparation, cleaning and shopping, Lanzillo notes that she makes the girl microwaveable meals,[2] runs her baths, gets her on the school bus, assists with her homework and takes her to appointments. *Id.* 224-25. Lanzillo also says that she is able to wipe her countertops and put laundry in the washer, but requires help bringing the laundry downstairs. *Id.* 226-27.

Lanzillo further indicated in her function report that she is able to drive a car and can go to stores to shop for small items, to the doctor, to the pharmacy and to her parents' house, which is ten minutes away. *Id.* She notes however, that she can no longer bend, cannot stand for more than 20 minutes at a time, walk for more than one-quarter of a mile or sit in a chair without shifting. *Id.* 228-29. She also states that she is no longer able to sleep in her bed and that her pain wakes her up every hour. *Id.* 224. Indeed, at her administrative hearing, conducted on June 1, 2018, Lanzillo testified that she cannot return to her job because she cannot sit for more than one hour at a time. *Id.* 45-46, 53. To this end, Lanzillo testified that whenever she sits for more than one hour, she experiences excruciating pain and has to spend the following day resting in a

---

[2] Lanzillo claims that she eats five pre-packaged snacks/meals because she is no longer able to stand and to cook. Her roommate cooks her one meal a day comprised of chicken and vegetables. *Id*. 46-48.

recliner with her legs elevated. *Id.* 46. She also testified that none of the treatments she has had, including her back and shoulder surgeries as well as the implantation of the nerve stimulator, have succeeded in alleviating her pain, which she says is an 8/10 most of the time. *Id.* 40-41, 44-45, 50-55.

With respect to medication, Lanzillo testified that she is taking or has taken methocarbamol, gabapentin, Vicodin and Lexapro. *Id.* 41. However, Lanzillo indicated that she gets side effects from the medications including nausea, tiredness and dizziness. *Id.* At the time of the hearing, Lanzillo was also going to physical therapy but anticipated that she would need more shoulder surgery. *Id.* 43, 55. With respect to her day to day routine, Lanzillo testified that she naps approximately six times each day. *Id.* 41-42. She also estimates that she can only stand and walk for less than an hour in an eight-hour period. *Id.* 50-51, 55. Finally, Lanzillo alleges that she is no longer able to engage in her hobbies of gardening or crocheting, because her back pain prevents her from lifting or kneeling and she is unable to reach or maneuver with her right arm. *Id.* 48-50. She says that the difficulty she is experiencing with her right arm is also preventing her from using a computer. *Id.* 49-50.

### B.    Medical Evidence

### 1.    Examinations and Treatment Prior to May 5, 2015 – the Onset Date of Disability

On April 15, 2011, the day Lanzillo was injured at work, she was treated at an urgent care center and released. *See id.* 617. After the incident, Lanzillo was seen by a neurologist, who prescribed muscle relaxants. *Id.* Then, on August 27, 2012, Lanzillo saw Richard A. Legouri, M.D., a physician at Long Island Bone and Joint, complaining of a dull ache located in the lumbosacral area, which was precipitated by heavy weight-lifting and aggravated by exertion.

*Id.* Lanzillo advised Dr. Legouri that she also had persistent hand pain following the injury and had been seen by a hand specialist who gave her a cortisone injection. *Id.*

On October 15, 2012, Lanzillo returned to Dr. Legouri, after she had an MRI of her lumbar spine, which showed the following: a disc bulge with midline annular tear and central broad base disc herniation deforming the dural sac at L4-5; diminished disc height at L5-S1; and bilateral facet arthropathy at L2-3 and L3-4. *Id.* 281, 553-55, 615-18. At the time, Lanzillo reported that she was no using pain killers and was treating the injury with a home exercise plan. *Id.* 615. Dr. Legouri noted that she was not disabled but, nonetheless, referred her to a specialist. *Id.* 616.

Almost three years later, on January 13, 2015, Lanzillo was moving a box on a high shelf at Taco Bell when she felt a sharp pain in her right shoulder. *Id.* 613. On January 22, 2015, she was seen by John J. Yu, M.D., at Long Island Bone and Joint, complaining that the pain in her right shoulder had been gradually worsening since the incident. *Id.* 613-14. She described the pain as a 4/10 while at rest and a 10/10 during movement. *Id.* 613. Dr. Yu reported that her shoulder wasn't swollen, there was no erythema (reddening of the skin) and her shoulder was neurovascularly intact. *Id.* 614. Dr. Yu also noted that Lanzillo's sensation and reflexes were normal; her strength was 4/5; her external rotation passive range of motion (PROM) was 35 degrees; and flexion PROM was 100 degrees. *Id.* Finally, Dr. Yu took an x-ray of her right shoulder, which showed no acute fracture or dislocation. *Id.* Dr. Yu diagnosed Lanzillo with impingement shoulder syndrome and sent her for an MRI. *Id.* Nonetheless, Dr. Yu opined that Lanzillo was fully disabled until further notice for the purpose of Worker's Compensation. *Id.*

One week later, on January 29, 2015, Lanzillo returned to Dr. Yu's office complaining of severe pain in her right shoulder, combined with sharp shooting pains radiating from the right shoulder, down the right side of her chest, to her hand and wrist.  *Id.* 610-11.  Dr. Yu examined Lanzillo and found that she still had a full range of motion, 5/5 strength and intact sensation.  *Id.* However, by that point, Dr. Yu had received the results of an MRI taken on January 23, 2015, which showed a nondisplaced fracture of the greater tuberosity with articular-sided partial tear of the adjacent supraspinatus and diffuse articular and interstitial fraying with proximal tendinopathy.  *Id.*  He diagnosed Lanzillo with a humerus fracture, a herniated disc in the lumbar region and a rotator cuff sprain.  *Id.*  He also noted her pre-existing diagnoses of cervical radiculitis, lumbago and radiculitis in the lumbosacral and/or thoracic regions.  *Id.*  Based on his findings, Dr. Yu recommended physical therapy and prescribed her a type of nonsteroidal anti-inflammatory drug and nonsteroidal anti-inflammatory agents (NSAIDs).  *Id.* 611.  At the January 29, 2015 visit, he changed his opinion concerning Lanzillo's disability noting that she was partially disabled.  *Id.*  Indeed, he categorized Lanzillo as having a 50% temporary impairment for Worker's Compensation.  *Id.*

Then, on February 17, 2015, Lanzillo returned to Dr. Yu, complaining of constant pain, which would increase to 7/10 with movement.  *Id.* 607-08.  Dr. Yu's findings were largely the same as they had been in January, but he added a diagnosis of adhesive capsulitis, also known as frozen shoulder, and recommended use of ultrasound and a TENS (transcutaneous electrical nerve stimulation) unit, as well as iontophoresis (transdermal drug delivery by use of a voltage gradient on the skin).  *Id.* 608.  He also referred Lanzillo to physical therapy.  *Id.*

On March 16, 2015, Lanzillo saw Dr. Yu, at which time she reported that her shoulder was improving.  *Id.* 605-06.  Lanzillo advised that her pain was intermittent and rating it as 2/10

and Dr. Yu found that on external rotation, her internal rotation was -12, her external rotation PROM was 60 degrees; an on flexion, her PROM was 170 degrees. *Id.* 606. However, Lanzillo noted that she had only gone to physical therapy once because of her back pain. *Id.* 605. In connection with her back complaints, Dr. Yu also reported that Lanzillo was being treated by Dr. Shukla for her back and that her back was being handled under a separate workers compensation claim. *Id.* As to her right shoulder, Dr. Yu found that Lanzillo's shoulder was healing, but that Lanzillo was still partially disabled. *Id.*

Four days later, Lanzillo was examined by Rasel M. Rana, D.O., at Long Island Bone and Joint, regarding her back pain. *Id.* 602-03. Although she didn't report it until a later visit, it appears that in early March, Lanzillo had gone to the emergency room at Mather Memorial Hospital complaining of back pain. *See id.* 599. In any case, Dr. Rana found that Lanzillo was able to walk heel to toe and on her toes and heels. *Id.* 603. He also found that she had no tenderness to the cervical or thoracic spine, the greater trochanteric bursa, or hip pain. Dr. Rana further reported that Lanzillo's sensation to light touch at T12-S1 was intact. *Id.* He did, however, find that Lanzillo had moderate tenderness on lumbar palpation and a moderate range of motion. *Id.* He also performed several tests, including a Babinski's Sign and FABER test, and concluded that Lanzillo had low back pain, lumbar spondylosis, degenerative disc disease of the lumbar spine, and left lumbar radiculopathy. *Id.* As a result, Dr. Rana recommended that Lanzillo have an MRI of the lumbar spine and he prescribed her Valium. *Id.* Finally, Dr. Rana concluded that Lanzillo was partially disabled for four weeks. *Id.*

On March 26, 2015, Lanzillo had an MRI of her lumbar spine, which showed a central disc herniation at L1-2, mild facet hypertrophy at L2-3 and L3-4, slight disc desiccation, a shallow protrusion with an annular fissure, facet hypertrophy and mild narrowing of the left

8

subarticular zone and left foramen at L5-S1. *Id.* 282-83. Following the MRI, Lanzillo returned to see Dr. Rana. *Id.* 599-600. Dr. Rana's findings at Lanzillo's April 2, 2015 visit were similar to his previous findings. *Id.* Specifically, Dr. Rana's assessment was that Lanzillo had a lumbar herniated disc, left lumbar radiculopathy, degenerative disc disease and lumbago. *Id.* 600. He also concluded that Lanzillo was partially disabled for four weeks. *Id.* His note from that visit indicates that he discussed the non-operative and operative treatment options with Lanzillo in detail including, continued non-operative management: NSAID, physical therapy, etc.; interventional modalities such as epidural injections; and surgical intervention such as microdiscectomy left L4-5. *Id.* The note further states:

> After failing extensive non operative care, patient is a surgical candidate. Patient wishes to proceed with surgical intervention after failing nonoperative care. I discussed risks, benefits and alternatives of the procedure in detail with patient. Risks and possible complications, including but not limited to, infection, bleeding, [nerve] injury, arterial and venous injury, single or multiple muscle group weakness, dural tear, CSF leak, psudomenigocele, epidural hematoma1 DVT, PE, CRPS, MI, paralysis, pseudoarthrosis, recurrent disc herniation, adjacent segment disease and risks of anesthesia. The patient understands and wishes to proceed. All questions answered and patient given information to review.

*Id.*

That same month, on April 20, 2015, Lanzillo returned to Dr. Yu to have her right shoulder examined. *Id.* 597-98. During the April 20 visit, Lanzillo rated her pain as 2/10 at rest, 8/10 during movement. *Id.* 597. Dr. Yu' s findings were similar to those on March 16, 2015, and he recommended that she continue physical therapy, ultrasound and use of a TENS unit. *Id.* 600. He also opined that Lanzillo was partially disabled as a result of her shoulder injury. *Id.* 598. Then, on April 28, 2015, Lanzillo returned to Dr. Yu, complaining of worsening pain, which she described as sharp and waking her from sleep. *Id.* 595-96. This time, Lanzillo rated the pain as

6/10.  *Id.* 595.  Dr. Yu recommended that Lanzillo follow up with Dr. Rana regarding the radicular pain in her right upper extremity.  *Id.* 596.

### 2. Medical Examinations and Treatment on and after May 5, 2015

On May 5, 2015, the day Lanzillo says she became disabled, Dr. Rana performed a microdiscectomy at left L4-5.  *Id*. 641-642.  During the surgery, Dr. Rana discovered a synovial cyst, which had to be removed.  *Id.*  Lanzillo explains that "[a] synovial cyst is a fluid-filled sac that develops as a result of degeneration in the spine," although "the symptoms and level of pain or discomfort may remain stable for many years." Pl.'s Mem. at 2.  She was advised that "[t]he pain probably comes from the venous blood around the nerves not being able to drain, which leads to pain and irritation of the nerves.  [However, sitting] down allows the blood to drain and relieves the pressure." Tr. 210-11, 246.

At her follow-up appointment on May 20, 2015, Lanzillo told Dr. Rana that her leg pain had decreased.  *Id.* 592-93.  Dr. Rana noted that Lanzillo's incision was healed and her straight leg test was negative bilaterally.  *Id.* 593.  Dr. Rana's assessment was that Lanzillo had degenerative disc disease, lumbar herniated disc, lumbago and left lumbar radiculopathy.  *Id.*  He prescribed Robaxin, a muscle relaxant, in addition to Norco, a combination of acetaminophen and hydrocodone.  *Id.* 592-93.  He concluded that Lanzillo would be fully disabled for four weeks.  *Id.* 593.

On June 1, 2015, Lanzillo returned to Dr. Yu for a follow-up appointment concerning her shoulder.  *Id.* 590-91.  Lanzillo reported that her pain was intermittent but unchanged.  *Id.* 590.  She rated it as an 8/10 and described it as sharp.  *Id.*  Dr. Yu indicated that physical therapy had been recommended but that she had had a lumbar microdiscectomy with Dr. Rana since her last

appointment.  He noted, however, that Lanzillo had returned to PT shortly after the surgery.  He advised her to follow-up in six weeks and continue with PT.  *Id.*

On June 17, 2015,[3] Lanzillo saw Dr. Rana for a follow-up.  Dr. Rana's record for that visit is somewhat confusing.  Dr. Rana notes the Lanzillo "[o]verall reports doing well [with] some pain in her left groin."  *Id.* 588.  Yet, he also indicates that Lanzillo described her pain as "sharp, dull and aching."  *Id.*  Lanzillo also advised Dr. Rana that she had "constant symptoms" and that the "symptoms [were] worsening."  *Id.*  She appears to have explained that her symptoms were exacerbated by bending but relieved by rest, ice and heat.  *Id.*  Dr. Rana continued assessment of Lanzillo was that she had lumbar herniated disc, degenerative disc disease and lumbar spondylosis.  *Id.* 589.  At that visit Dr. Rana again noted that Lanzillo was fully disabled for 6 weeks and referred her to physical therapy.  *Id.*  Following his recommendation, Lanzillo received physical therapy for her lumbar spine at Port Jefferson Physical Therapy approximately thirty times from June 22, 2015, through September 29, 2016.  *Id.* 297-361.

During that time period, she saw Dr. Rana again on July 30, 2015, complaining of pain in the left groin and numbness in her left calf.  *Id.* 587-88.  Dr. Rana found that she had no limitation in motion but his continued assessment was that Lanzillo had lumbar herniated disc, lumbar spondylosis and degenerative disc disease (lumbar).  *Id.*  He recommended that she continue physical therapy and begin taking Mobic, a nonsteroidal anti-inflammatory drug (NSAID).  *Id.*  On July 30, Dr. Rana found Lanzillo to be fully disabled for four weeks.  *Id.*

On August 3, 2015, Lanzillo then had a follow-up appointment with Dr. Yu concerning her right shoulder.  *Id.* 583-84.  She advised Dr. Yu that her pain, while intermittent, was sharp

---

[3] The Seventeenth Encounter in Lanzillo's char is an office visit on June 17, 2015.  However, the date of the physical examination associated with that visit is June 21, 2015.  *Id.* 588-89.

and stabbing. *Id.* She rated it at a 10/10. *Id.* Although her sensation and reflexes were normal, her examination revealed tenderness over the long head of the right biceps and over the right supraspinatus. *Id.* 584. Accordingly, Dr. Yu diagnosed Lanzillo with tenosynovitis (bicipital), adhesive capsulitis (frozen shoulder), greater tuberosity of humerus fracture and rotator cuff sprain. *Id.* 585. At that visit, Dr. Yu stated that Lanzillo was fully disabled until further notice. *Id.*

A little over three weeks later, Lanzillo saw Dr. Rana with complaints of continued pain in her left lateral leg into the groin. *Id.* 582-83. Dr. Rana assessed lumbar spondylosis, herniated disc, degenerative disc disease and lumbago, and prescribed Neurontin, an anticonvulsant. *Id.* 583. Notably, at that visit, Dr. Rana opined that Lanzillo was only partially disabled for six weeks and could return to work on September 2, 2015, on light duty, with the following restrictions: work no more than four hours per day, no bending on her back and no lifting of more than ten pounds. *Id.*

On September 3, 2015, the day after she allegedly could return to work, Lanzillo returned to see Dr. Yu and reported constant shoulder pain, which she rated as 5/10. *Id.* 580. Dr. Yu diagnosed her with a sprain of the right rotator cuff capsule and impingement shoulder syndrome. *Id.* 581. He also recommended surgery, namely, a right shoulder arthroscopy, rotator cuff repair, subacromial decompression, possible distal clavicle excision, and possible SLAP repair. *Id.* Dr. Yu again stated that Lanzillo was fully disabled until further notice. *Id.* Then, on September 17, 2015, Dr. Yu prescribed a brace for Lanzillo's shoulder. *Id.* 579. On September 30, 2015, Dr. Yu performed right shoulder arthroscopic surgery, with a rotator cuff repair, subacromial decompression and labral debridement. *Id.* 548-49, 627.

On October 7, 2015, Lanzillo had a follow-up visit for her lumbar spine with Dr. Rana, at which time she reported that her condition was improving. *Id.* 576-77. Indeed, she stated that she had no numbness, tingling or weakness and was taking Advil for pain. *Id.* She did note, however, that she had flare-ups of sciatica, which resolved on their own. *Id.* Dr. Rana examined Lanzillo and found no limitation in motion in her back or legs and that her lower extremities had full motor strength. *Id.* 577. Accordingly, Dr. Rana found Lanzillo to be asymptomatic and recommended that she gradually return to activities as tolerated. *Id.*

On October 8, 2015, Lanzillo saw Dr. Yu for her postoperative follow-up appointment. *Id.* 575. She reported that her symptoms had worsened slightly since the operation and that her postoperative pain had been severe. *Id.* Dr. Yu prescribed Lanzillo Vicodin and stated that she was disabled under further notice. *Id.* One month later, on November 12, 2015, Lanzillo returned to Dr. Yu complaining of right shoulder pain, which she rated as a 7/10. *Id.* 573-74 Dr. Yu examined Lanzillo and found no acute distress. *Id.* 573. He reported that her incisions were healing well although he did see some discoloration on her skin resulting from below-surface bleeding. *Id.* In addition, Lanzillo shoulder was neurovascularly intact and she had normal sensation. *Id.* On external rotation, her active range of motion (AROM) was 60 degrees; on flexion, her AROM was 90 degrees and PROM was 150 degrees; on glenohumeral abduction, her PROM was 90 degrees. *Id.* 573. Nonetheless, based on his examination, Dr. Yu reported that Lanzillo was fully disabled. *Id.* 574.

On December 10, 2015, Dr. Rana examined Lanzillo for complaints of lumbar and left hip pain. *Id.* 571-72. His examination of Lanzillo's lumbar spine revealed a well-healed incision, no pain with range of motion, no limitation in motion, and full muscle strength. *Id.* 572. However, he reported that Lanzillo had "exquisite tenderness to palpation" near her left

13

greater trochanter.  *Id.*  Dr. Rana assessment of Lanzillo was that she had a lumbar herniated disc, left lumbar radiculopathy, degenerative disc disease in the lumbar region and greater trochanteric bursitis.  *Id.*  He gave her an injection of Aristospan and lidocaine and, once again, reported that she was fully disabled for four weeks.  *Id.*

On December 22, 2015, Lanzillo saw Dr. Yu for a followed up concerning her right shoulder.  *Id*. 569-70.  On examination, the right shoulder was neurovascularly intact, with normal sensation, no ecchymosis and well-healed incisions.  *Id.* 569.  However, on external rotation, her AROM was 60 degrees; on flexion, her AROM was130 degrees and PROM was 170 degrees; on glenohumeral abduction, her PROM was 130 degrees.  *Id.*  Dr. Yu concluded that Lanzillo had impingement shoulder syndrome and he restarted her on Vicodin and opined that she was fully disabled.  *Id*. 570.

Lanzillo followed up with Dr. Rana on January 7, 2016 regarding her low back pain.  *Id.* 567-68.  This time, his examination revealed minimal tenderness to palpation over the left greater trochanter of the left hip.  *Id.* 568.  He reported that "light touch sensation" was intact at T12-S1.  *Id.*  His assessment of Lanzillo was that she had a lumbar herniated disc, thoracic or lumbosacral neuritis or radiculitis, degenerative disc disease in the lumbar region and greater trochanteric bursitis on the left side.  *Id.*  Dr. Rana reported that Lanzillo was fully disabled for four weeks.[4]  *Id.*

At an appointment with Dr. Yu, on February 1, 2016, Lanzillo then reported that the pain in her shoulder was intermittently dull and aching but that her symptoms were improving.  *Id.* 564-65.  Dr. Yu reported that sensation to her right shoulder was normal and her muscle strength was 4-/5 to 5/5.  *Id*.  Yet, her still concluded that she was fully disabled.  *Id.*

---

[4] On January 22, 2016, Dr. Rana entered a note requesting that Lanzillo be excused from jury duty because she could not sit for prolonged periods of time.  *Id*. 566.

On February 11, 2016, Lanzillo advised Dr. Rana that her radicular back pain had resolved at some point after her surgery, but that she was experiencing axial pain. *Id.* 562-63. She reported that she was taking NSAIDs, and, at times, Vicodin, as well as using ice and heat, but these medications did not effectively relieve her pain. *Id.* 562. On examination, Lanzillo had minimal tenderness over the left greater trochanter of her left hip. *Id.* 563. Dr. Rana assessment was that Lanzillo had thoracic or lumbosacral neuritis or radiculitis, lumbar herniated disc, and lumbar spondylosis and he referred her to a pain management specialist, Jacob J. Rauchwerger, M.D., for a lumbar facet block injection at L4-5. *Id.*; see Id. 551-52, 619-26, 629-30. On February 22, 2016, Lanzillo saw Dr. Rauchwerger who prescribed Vicodin, Robaxin and Lidoderm patches. *Id.* 620-22.

On March 17, 2016, Lanzillo once again saw Dr. Yu for her right shoulder. *Id.* 560-61. She described her pain as intermittent and rated her pain level at rest as 4/10, but greater during motion. *Id.* 560. Dr. Yu's findings remained largely unchanged. *Id.* 560-61. His assessment of Lanzillo was that she had right bicipital tenosynovitis along with impingement syndrome of the right shoulder. *Id.* At her March 17 appointment, Dr. Yu gave her an injection in the shoulder of a combination of betamethasone acetate and betamethasone sodium together with lidocaine. *Id.* 561.

Then, on March 24, 2016, Dr. Yu completed a Physical Ability Assessment form for Lanzillo's disability insurance provider, in which he stated that Lanzillo had a right rotator cuff tear. *Id.* 287-88. In the boxes for grasping or fine manipulation with either hand, he wrote that she had no restrictions. *Id.* He also noted that she had no restrictions in balancing, stooping, kneeling, crouching or using foot controls. *Id.* He did, however, check the boxes indicating that Lanzillo could only sit, stand and/or walk from 2.5 to 5.5 hours a day; could reach overhead and

15

at desk waist level 0-2.5 hours a day; could lift and/or carry up to 10 pounds more than 5.5 hours a day; could lift and/or carry heavier weights (11 to 100+ pounds) 0-2.5 hours a day; and could push and/or pull more than 5.5 hours a day, but no more than 10 pounds at a time. *Id.* Finally, Dr. Yu reported that Lanzillo could occasionally crawl. *Id.*

On March 25, 2016, Dr. Rana saw Lanzillo again and found that she had minimal tenderness when he palpated her left greater trochanter of the left hip but axial pain with range of motion, mostly on extension. *Id.* 558-59. Dr. Rana assessment at the March 25 visit was lumbar spondylosis, greater trochanteric bursitis (left), lumbar herniated disc, left lumbar radiculopathy and degenerative disc disease. *Id.* 286. He reported that Lanzillo was fully disabled for six weeks.[5] *Id.*

Lanzillo saw Dr. Rauchwerger, the pain specialist, again on April 14, 2016, and he administered a lumbar medial branch block to the left L3 and L4 medial branch nerves. *Id.* 551-52. At a follow-up appointment two weeks later, Lanzillo reported that she had experienced relief for three days after the procedure. *Id.* 623-24. Then, on May 11, 2016, Lanzillo told Dr. Rauchwerger that she was taking Vicodin twice a day and still felt aching, burning, throbbing and pain, which increased with walking. *Id.* 629-30.

On April 28, 2016, Lanzillo returned to Dr. Yu complaining that her right shoulder was constantly aching and in pain, which she rated as 4/10 at rest, increasing with motion. *Id.* 556-57. She also reported having weakness. *Id.* She stated that her treatment regimen included a home exercise program and pain medication for her back, which "helped on the surface," but only briefly. *Id.* Dr. Yu examined Lanzillo an noted that on external rotation, her AROM was 60

---

[5] Between March 4, 2015 and March 26, 2016, Lanzillo had received physical therapy approximately 70 times. *Id.* 364-546.

degrees; on flexion, her AROM was 180 degrees and PROM was 170 degrees; on glenohumeral abduction, her AROM was 160 degrees and PROM was 160 degrees. *Id.* He assessed her strength as 4-/5 to 5/5. *Id.* Dr. Yu's assessment was that Lanzillo had a superior glenoid labrum lesion of the right shoulder. *Id.* He also noted that given her persistent pain in the biceps region, he was suspicious for a possible SLAP (superior labral tear from anterior to posterior) tear or biceps tendon tear. *Id*. 557. He recommended that Lanzillo get an MRI and opined that she was partially disabled. *Id.*

On June 1, 2016, Lanzillo saw Kanista Basnayake, M.D. for a consultative orthopedic examination. *Id.* 634-37. Lanzillo complained to Dr. Basnayake that she had constant pain in her lower back, radiating to her left leg, and constant pain in her shoulder. *Id.* She rated her lower back pain as 7/10, increasing with prolonged activity. *Id.* She rated her shoulder pain as 5/10, worsening with movement. *Id.* She also reported experiencing pain in her right knee for the past month, stating that the knee had "locked" three times. *Id.* Lanzillo advised Dr. Basnayake that she was taking Lexapro, Vicodin, Robaxin and Lidocaine patches. *Id.* She said that she was unable to cook, clean or do laundry but could shop once per week, shower and dress daily, watch television, listen to the radio, read and socialize with friends. *Id.* Dr. Basnayake reported that, on examination, Lanzillo did not appear to be in acute distress. *Id.* The doctor found her gait, squat and station to be normal, and noted that she was able to walk on heels and toes without difficulty. *Id.* Dr. Basnayake also remarked that Lanzillo used no assistive device and needed no help changing for the exam or getting on or off the exam table. *Id*.

In addition, Dr. Basnayake found that Lanzillo's hand and finger dexterity were intact and her grip strength was full (5/5) bilaterally. *Id.* She was able to zip, button and tie. *Id.* Her

cervical spine had normal ranges of motion as did her shoulders, bilaterally, although Lanzillo complained of pain with internal and external rotation.  *Id.*  Lanzillo had full range of motion of her elbows, forearms, wrists and fingers bilaterally.  *Id.*  Her strength was full in the proximal and distal muscles of her upper extremities, and she had no muscle atrophy or sensory abnormality.  *Id.*  With respect to her spine, Dr. Basnayake reported that Lanzillo's thoracic and lumbar spine had limited ranges of motion - extension 15 degrees, flexion 60 degrees, lateral flexion 20 degrees bilaterally and lateral rotation 20 degrees bilaterally.  *Id.*  Moreover, Dr. Basnayake found no sign of spinal or paraspinal tenderness.  *Id.*  Dr. Basnayake reported that the straight leg raise testing was positive on the left to 30 degrees in the sitting and supine positions; it was negative on the right.  *Id.*  But her lower extremities had full range of motion and strength with no atrophy and normal reflexes and sensation.  *Id.*  Dr. Basnayake then x-rayed her lumbosacral spine and noted that it was negative and showed that the height of the vertebral bodies and intervertebral disc spaces was relatively well maintained and the pedicles were intact. *Id.* 636, 638.  Based on the above, Dr. Basnayake assessed Lanzillo as having pain in the low back and right shoulder.  *Id.*  She opined that Lanzillo had a moderate limitation for prolonged sitting, standing, walking, climbing, bending, lifting, carrying, kneeling, reaching, handling and holding.  *Id.* 637.

### 3. Medical Examinations and Treatment in 2017 and 2018 beginning with the Placement of the Spinal Cord Stimulator

In October 2017, Dr. Rauchwerger performed an operation to place a permanent spinal cord stimulator in Lanzillo's lower back.  *Id.* 643-44.  Seven months later, on May 1, 2018, Lanzillo then saw Tim J. Golub, a Doctor of Physical Therapy (DPT), who performed a functional test.  *Id.*  645-48.  Dr. Golub reported that Lanzillo was able to stand for ten minutes, sit for 13 minutes and walk for "0.0 miles." *Id.* 646.  However, in the questionnaire that he

completed on the same day, Dr. Golub also stated that in an 8-hour workday, Lanzillo could sit for three hours and stand and/or walk for two hours. *Id*. 650. He also noted that Lanzillo could crawl on her hands and knees but not on her hands and feet. *Id*. 647. He further stated that Lanzillo was unable to complete the lifting or carrying portion of the evaluation and was unable to reach with either her left or right arm. *Id*. 646, 650. In addition, she was unable to push and pull more than five pounds. *Id*. 646. Dr. Golub opined that Lanzillo would need to take 15-minute breaks several times per hour and would be absent from work more than three times per month. *Id*. 651. As such, he concluded that Lanzillo was unable to return to work in any capacity because she was not capable of lifting or carrying anything. *Id*. 648.

In February 14, 2018, Lanzillo had a CT scan of her cervical spine, which showed "[d]isc space narrowing at C6-C7 with a large left lateralizing disc herniation resulting in severe central canal stenosis . . . impinging the left ventral cord . . . [and] a [sic] associated left paracentral osteophytic ridge[,] left greater than right." *Id*. 639-40. The scan also showed disc space narrowing at C5-C6, with mild facet arthropathy and minimal uncovertebral joint hypertrophy, and shallow disc herniation at C7-T1, resulting in mild central canal stenosis. *Id*.

### C.    Vocational Evidence

At Lanzillo's hearing, the defendant produced Suman Srinivasan ("Srinivasan"), a vocational expert, who testified that Lanzillo's past work as a fast food services manager was "light, skilled work performed at a heavy level." *Id*. 60. ALJ then asked Srinivasan if a hypothetical individual would be able to perform Lanzillo's past relevant work, either as actually performed or as those jobs are generally performed in the national economy assuming the following hypothetical:

> [A]n individual of the claimant's age, education, and work experience can perform work at the light exertional level as defined by the regulations. The

19

individual can frequently operate hand controls, push or pull, reach, handle, fingering, and feel with both upper extremities. The individual can occasionally push or pull, operate foot controls with both lower extremities. The individual can occasionally kneel, crouch, stoop, ambulance, and crawl; can occasionally climb stairs and ramps; can never climb ladders, ropes, and scaffolds; and can never be exposed to unprotected heights and moving mechanical parts. The individual can tolerate occasional exposure to vibration. In addition, assume that the individual is able to understand, carry out, and remember simple instructions and make simple work-related decisions.

*Id.* 60-1. Over plaintiff's counsel's objection that the hypothetical posed was not based on any evidence in the file, Srinivasan said "No." "Not past work." *Id.* 61. The ALJ then asked Srinivasan if Lanzillo could perform "any other jobs in the national or regional economy." Srinivasan responded:

Yes, Your Honor. At the light, unskilled level, may I give you the examples of a merchandise marker. DOT number of 209.587-034. Approximately 300,000 jobs nationally. The person would be a motel cleaner. DOT number of 323.687-014. Approximately 170,00.0 jobs nationally. May I offer the example of a mail clerk. DOT number of 209.687-026. Around 50,000 jobs - nationally. All of these are light, unskilled, SVP 2 jobs.

*Id.* The ALJ posed a second hypothetical:

Assume an individual of claimant's age, education, and work experience has the residual functional capacity set forth in Hypothetical No. 1, but the individual must be allowed to stand up to 5 minutes after every 30 minutes of sitting and to sit down after 5 minutes after every 30 minutes of standing while remaining on task. . . . The individual can occasionally -- give me one second. The individual can occasionally reach -- I'm sorry -- can occasionally push or pull, reach, handle, finger, feel with the right dominant upper extremity. The individual would be off task 10 percent of the workday. Are there jobs in the national or regional economy such an individual can perform?

*Id.* 63. Once again, over counsel's objection, Srinivasan responded that the individual in the second hypothetical could be a counter clerk, a furniture rental clerk, or an investigator of dealer accounts. *Id.* However, Srinivasan acknowledged that the DOT or SCO did not address situations where a person would have to change positions at workstations nor did it address off-task tolerances. *Id.* 63-4.

The ALJ then asked Srinivasan a third hypothetical involving a person who would have to be off task 20 percent of the workday, absent from work two or more days per month and would need to lie down for 20 minutes out of out of every hour of the workday but could perform work at the sedentary exertional level instead of the light level.  Srinivasan stated that there were no jobs in the national economy that the individual could perform. *Id.* 66.

Lanzillo's counsel then asked the Srinivasan to consider a hypothetical individual who, in an eight hour workday, could neither sit for six hours nor stand and walk for two hours, and who could not lift and carry 10 pounds.  *Id.*  67-68.  Srinivasan replied that sedentary work would not be available for such an individual.  *Id.* 68.

## DISCUSSION

### I.    Standard Of Review

### A.    Review of the ALJ's Decision

In reviewing a decision of the defendant, a district court may set aside a determination "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole."  *Greek v. Colvin,* 802 F.3d 370, 374-75 (2d Cir. 2015) (citations omitted); *see* 42 U.S.C. § 405(g).  "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Selian v. Astrue,* 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales,* 402 U.S. 389, 401) (internal quotation marks omitted)).  Furthermore, the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive, 42 U.S.C. § 405(g), and thus, the reviewing court does not decide the case *de novo.  Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir. 2004); *see Clark v. Comm'r of Soc. Sec.,* 143 F.3d 115, 118 (2d Cir. 1998) ("[I]t is up to the agency, and not [the] court, to weigh the conflicting evidence in the

record"); *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir. 1991) (holding that if the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review").

### B.    The Disability Determination

To be eligible for disability benefits under the Act, a claimant must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *see Burgess v. Astrue,* 537 F.3d 117, 119 (2d Cir. 2008). The Act further states that this impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *see Shaw v. Chater*, 221 F.3d 126, 131-32 (2d Cir. 2000); *Nascimento v. Colvin*, 90 F. Supp. 3d 47, 51 (E.D.N.Y. 2015); *Marinello v. Comm'r of Soc. Sec*., 98 F. Supp. 3d 588, 592-93 (E.D.N.Y. 2015).

In order to determine whether a claimant is disabled within the meaning of the Act, the SSA has promulgated regulations prescribing a five-step sequential analysis for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520; 416.920. The Second Circuit has summarized this procedure as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the Commissioner next considers whether the claimant has a 'severe impairment' which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the

22

claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Commissioner will consider [her] disabled without considering vocational factors such as age, education and work experience . . . .  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work.  Finally, if the claimant is unable to perform [her] past work, the Commissioner then determines whether there is other work which the claimant can perform.

*Telavera v. Astrue,* 697 F.3d 145, 151 (2d Cir. 2012).  The claimant bears the burden of proof at steps one through four of the sequential inquiry, while the burden shifts to the Commissioner at step five to show that the claimant is capable of working.  *Id.*; *Nascimento,* 90 F. Supp. 3d at 51.  In making these determinations, the Commissioner "must consider four factors '(1) the objective medical facts; (2) diagnosis or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; (4) the claimant's educational background, age, and work experience.'" *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983)(per curiam)).

## II.    Analysis

### A.    The ALJ's Ruling

With respect to steps one and two, the ALJ determined:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2020.

2.    The claimant has not engaged in substantial gainful activity since May 5, 2015, the alleged onset date (20 CFR  404.1571 et seq.).

3.    The  claimant has the following severe impairments:  lumbar degenerative disc disease with spondylosis, disc herniation, and radiculopathy; adhesive capsulitis of the shoulder, tear of rotator cuff, impingement syndrome of the right shoulder; bicipital tenosynovitis; and cervical radiculitis and stenosis (20 CFR 404.1520(c)).

Tr. at 15.  The ALJ also mentioned that Lanzillo's medically determinable impairments described in item 3 above significantly limited her ability to perform basic work activities as

required by SSR 85-28.  However, the ALJ determined that Lanzillo's hip bursitis (8F-l) and a Baker cyst of the right knee (8F-l) were non-severe and had a minimal effect on her ability to perform basic work activities. (20 CFR 404.1522, 416.920(c), and 416.922).  *Id.* at 16.  He also found Lanzillo's medically determinable mental impairment of anxiety did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and was, therefore, non-severe.  *Id.*

With respect to step three and four, the ALJ found that Lanzillo did not have an impairment or combination of impairments that meet or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R §§ 404.152(d), 404.1525 and 404.1526).  *Id*. at 18.  To this end, the ALJ noted:

> The claimant's adhesive capsulitis of the shoulder, rotator cuff tear with impingement syndrome of the right shoulder, and bicipital tenosynovitis were considered under Listing 1.02 (B) Major *dysfunction of a joint due to any cause*. This listing requires a condition characterized by a gross anatomical deformity, chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s) and findings using appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  These conditions must be met along with involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in the "inability to perform fine and gross movements effectively", as defined in 1.00B2c.  The "inability to perform fine and gross movements effectively" means an extreme loss of function that interferes very seriously with the ability to carry out the activities of daily living.  In this case, the claimant does not have left arm impairment; therefore, she does not meet or medically equal the requirements of this listing.

> The claimant's cervical radiculitis and stenosis and lumbar degenerative disc disease with spondylosis, with disc herniation and radiculopathy were considered under Listing 1.04, *Disorders of the spine.* The claimant does not meet the requirements of this listing because the record does not demonstrate compromise of a nerve root or the spinal cord with evidence of nerve root compression a limited motion of the spine, motor loss and sensory or reflex loss, resulting in and positive straight-leg raising, or spinal arachnoiditis or lumbar spinal stenosis resulting in pseudoclaudication, any of which has resulted in an "inability to ambulate effectively,'" as defined in 1.00B2b.

> "Inability to ambulate effectively" generally means that there is an "extreme" limitation in walking. The records show the claimant was observed to have an uneven gait in February 2016 (6F-3), and a normal gait at the consultative examination in June 2016 (8F-2).

*Id*. 18.

The ALJ then found that Lanzillo had the residual functional capacity to perform light work as defined in 20 CFR § 404.1567(b) except 404.1567(b), except that she must be allowed to stand up to five minutes after every 30 minutes of sitting and to sit down up to five minutes after every 30 minutes of standing, while remaining on task. *Id.* He noted that she could not climb ladders, ropes or scaffolds but could occasionally climb stairs, balance, stoop, kneel, crouch, crawl and operate foot controls with her lower extremities. *Id.* He also found that she could frequently reach, handle, finger, push and pull, and be exposed to vibration. Finally, the ALJ determined that Lanzillo was able to understand, carry-out, and remember simple instructions, and make simple work related decisions but would have to be off task 10 percent of the workday. As a result, the ALJ found that the totality of the medical evidence failed to support limitations beyond those set forth in the above-stated residual functional capacity.

Nonetheless, in answer to the inquiry as to whether despite the claimant's impairment, she had the residual functional capacity to perform her past work, the ALJ determined that Lanzillo was unable to perform any past relevant work. *Id.* 24-5. He noted that Lanzillo's current residual functional assessment limits her to unskilled light work, whereas her past relevant work was performed at the skilled and heavy exertional level. *Id.* 24. Accordingly, the ALJ considered whether there was other work which Lanzillo could perform and concluded that based on her age, education, and work experience, there were other jobs in the national economy that Lanzillo could perform, including:

(1) Counter clerk (DOT 249.366-010), which is classified at the light exertional level and is unskilled with an SVP of 2, with an estimated 6,000 jobs in the national economy.

(2) Furniture rental clerk (DOT 295.357-018), which is classified at the light exertional level and is unskilled with an SVP of 2, with an estimated 53,000 jobs in the national economy.

(3) Investigator of dealer accounts (DOT 241.367-038), which is classified at the light exertional level and is unskilled with an SVP of 2, with an estimated 45,000 jobs in the national economy.

*Id.* 25.  As such, the ALJ found that Lanzillo was not disabled under the Act.  *Id.* at 26.

## B.    Weight of Medical Evidence

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the Act."  *Pena ex rel. E.R. v. Astrue,* 11-CV-1787, 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1527(c); 416.9279(c).  Social Security regulations require that an ALJ give "controlling weight" to the medical opinion of an applicant's treating physician so long as that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §404.1527(c)(2); *see Halloran,* 362 F.3d at 32.  Medically acceptable clinical and laboratory diagnostic techniques include consideration of a "patient's report of complaints, or history, [a]s a diagnostic tool." *Green-Younger v. Barnhart,* 335 F.3d 99, 107 (2d Cir. 2003); *see Petrie v. Astrue,* 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient").  Although a treating physician may share an opinion regarding the severity of the disability, the ultimate

26

decision of whether an individual is disabled is "reserved to the Commissioner." 20 C.F.R. § 404.1527(d)(1); *see Snell v. Apfel,* 177 F.3d 128, 133 (2d Cir. 1999).

Indeed, under the treating physician rule, an ALJ must give special evidentiary weight to the opinion of a treating physician. *See Clark*, 143 F.3d at 119. Specifically, the treating physician rule "mandates that the medical opinion of the claimant's treating physician [be] given controlling weight if it is well supported by the medical findings and not inconsistent with other substantial record evidence." *Shaw*, 221 F.3d at 134; *see also, e.g., Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir 1999). When the ALJ declines to give a treating physician's opinion controlling weight, the ALJ "must consider various factors to determine how much weight to give to the opinion." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). These factors include "(i) the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion, (iii) consistency of the opinion with the entirety of the record; (iv) whether the treating physician is a specialist; and (v) other factors that are brought to the attention of the SSA that tend to support or contradict the opinion." *Id.*; *see Selian,* 708 F.3d at 418. The ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." *Burgess,* 537 F.3d at 129-30; *see* 20 C.F.R. § 404.1527(d)(2). Failure to provide "good reasons" for the weight assigned to a treating physician constitutes a ground for remand. *Snell,*177 F.3d at 133; *see Halloran,* 362 F.3d at 32-33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians['] opinion").

Upon careful review of the administrative record and the ALJ's decision, the undersigned finds that the ALJ failed to properly evaluate the medical evidence. The ALJ accorded little weight to the opinions of Dr. Yu, Dr. Rana and Dr. Golub and only some weight to the opinion

of Dr. Basnayake.  Specifically, the ALJ assigned "little weight" to the opinion of Dr. Yu that Lanzillo was fully disabled finding that the Dr.'s opinions were all rendered within the purview of Worker's Compensation law.  Tr. 22-2.  He discounted Dr. Golub's opinion the Lanzillo would be unable to return to work in any capacity because Dr. Golub's opinion was based on a one-time examination of the claimant and provided conclusions for a specific activity without any objective findings.  *Id.* 23.  With respect to Dr. Rana, the ALJ focused only on the letter he had written to excuse her from jury duty and noted that it had limited weight.  Finally, as to Dr. Basnayake's opinion, the ALJ gave some weight to the Dr. Basnayake's opinion that due to lower back pain and right shoulder pain, Lanzillo would have moderate limitation for prolonged sitting, standing, walking, climbing, bending, lifting, carrying, kneeling, reaching, handling, and holding.  However, the ALJ found that such findings were somewhat vague.  *Id.* 23.

Moreover, the ALJ reached the conclusion that Lanzillo was able to perform other jobs in the national economy notwithstanding the fact that Lanzillo had testified that she could no longer bend; could not stand for more than 20 minutes at a time; could not walk for more than one-quarter of a mile; could not sit for more than one hour at a time; was no longer able to sleep in her bed; and had pain that wakes her up every hour.  *Id.* 45-46, 53, 224, 228-29.  Indeed, Lanzillo testified that whenever she sits for more than one hour, she experiences excruciating pain and has to spend the following day resting in a recliner with her legs elevated.  *Id.* 46.  She also averred that her pain is an 8/10 most of the time.  *Id*. 40-41, 44-45, 50-55.  The Court recognizes that when assessing a plaintiff's credibility, SSA regulations require an ALJ "to take the claimant's report of pain and other limitations into account, but [that] the ALJ is not obligated to accept the claimant's subjective complaints without question."  *Campbell v. Astrue*, 465 Fed. Appx. 4, 7 (2d Cir. 2012)(quoting *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010)); *see also Fontanarosa v.*

*Colvin*, 13-CV-3285, 2014 WL 4273321, at *12 (E.D.N.Y. Aug. 28, 2014).  However, "[a]t the

first step, the ALJ must decide whether the claimant suffers from a medically determinable

impairment that could reasonably be expected to produce the symptoms alleged." *Genier*, 606

F.3d at 49 (citing 20 C.F.R. § 404.1529(b)).  Second, "the ALJ must consider 'the extent to

which [the claimant's] symptoms can reasonably be accepted as consistent with the objective

medical evidence and other evidence, including claimant's statements, treating physician's

reports, and other medical professional reports." *Fontanarosa*, 2014 WL 4273321, at *12 (citing

*Whipple v. Astrue*, 479 Fed. Appx. 367, 370-71 (2d Cir. 2012)).  "To the extent that a claimant's

allegations of pain 'are not substantiated by the objective medical evidence, the ALJ must [then]

engage in a credibility inquiry.'" (quoting *Meadors v. Astrue*, 370 Fed. Appx. 179, 184 (2d Cir.

2010) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii)).

> The ALJ must consider these seven faction in making a credibility determination:
> (1) the claimant's daily activities; (2) the location, duration, frequency, and
> intensity of claimant's pain and other symptoms; (3) precipitating and aggravating
> factors; (4) the type, dosage, effectiveness, and side effects of any medication the
> claimant takes or has taken to alleviate pain or other symptoms; (5) any treatment,
> other than medication, the claimant has received; (6) any other measures the
> claimant employs to relieve pain or other symptoms; and (7) other factors
> concerning the claimant's functional limitations and restrictions as a result of pain
> or other symptoms.

*See* 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(3).  In this case, the ALJ did not engage in

a sufficient credibility inquiry.  Indeed, the record suggest that Lanzillo's allegations of pain

were consistent with her daily activities, her medical treatment and the opinions of her treating

physicians.

Notably, in reaching his conclusion that Lanzillo was not disabled despite her reports of

pain and limitations, the ALJ relied heavily upon Srinivasan conclusion that Lanzillo's could be

a counter clerk, a furniture rental clerk, or an investigator of dealer accounts.  That opinion also

entirely disregarded the contrary findings of Dr. Golub, in part, because he is a physical therapist.  Yet, even Srinivasan acknowledged that the DOT or SCO does not address situations where a person would have to change positions at workstations nor did it address an employer's tolerances to the need for such changes.  *Id*. 63-4.  Moreover, when Lanzillo's counsel then asked the Srinivasan to consider instead a hypothetical individual who, in an eight hour workday, could neither sit for six hours nor stand and walk for two hours, and who could not lift and carry 10 pounds, Srinivasan replied that sedentary work would not be available for such an individual. *Id.* 68.  Nevertheless, the ALJ found Srinivasan's testimony about the other jobs Lanzillo could perform in the national economy to be more persuasive that the medical evidence she offered. *Id.* 26.

"If the ALJ rejects [a plaintiff's] testimony after considering the objective medical evidence and any other factors deemed relevant, he must explain that decision with sufficient specificity to permit a reviewing court to decide whether there are legitimate reasons for the ALJ's disbelief.*" Ingrassia*, 239 F.Supp.3d at 627 (quoting *Correal-Englehart v. Astrue*, 687 F.Supp.2d 396, 435 (S.D.N.Y. 2010).  "Where the ALJ neglects to discuss at length his credibility determination with sufficient detail to permit the reviewing court to determine whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence, remand is appropriate." *Ingrassia*, 239 F.Supp.3d at 627 (citing *Correal-Englehart*, 687 F.Supp.2d at 435-36; *see also Gross v. Comm'r of Soc. Sec.*, 08-CV-41372011 WL 128565, at *5 (E.D.N.Y. Jan. 14, 2011); *Valet*, 2012 WL 194970, at *22 (remanding because the ALJ failed to address all seven factors).  Here, the ALJ did not properly described his rational for discrediting Lanzillo's testimony at the administrative hearing.  Thus, for this reason alone, the undersigned recommends that this matter be remanded.

Second, with respect to Dr. Yu's opinion, the ALJ assigned "little weight" to his opinion as he found that the conclusion of "ability to work" was "reserved to the Commissioner." Tr. 23. However,

> Reserving the ultimate issue of disability to the Commissioner relieves the [SSA] of having to credit a doctor's finding of disability, but it does not exempt administrative decisionmakers from their obligation, under *Schaal* and § 404.1527(d)(2), to explain why a treating physician's opinions are not being credited. The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even-and perhaps especially-when those disposition are unfavorable.

*Snell,* 177 F.3d at 134; *see also Castro v. Comm'r of Soc. Sec.*, No. 15-CV-336, 2016 U.S. Dist. LEXIS 43782, at *49, 2016 WL 1274542 (E.D.N.Y. Mar. 31, 2016); *Austin v. Colvin*, No. 14-CV-861, 2016 U.S. Dist. LEXIS 10200, 2016 WL 335255 (W.D.N.Y. Jan. 28, 2016).

In addition, the ALJ's other reasons for affording little weight to the opinions of Lanzillo's treating physicians was faulty. With respect to the opinions of Dr. Yu, the ALJ assigned "little weight" to his opinion concerning the nature and severity of Lanzillo's impairments because Dr. Yu's disability determinations were based on Worker's Compensation law. However, Dr. Yu's detailed medical records painted a clear picture of Lanzillo's condition and work limitations. *Id.* 22-23. In addition, the ALJ utterly failed to reference numerous assessments and opinions as to Lanzillo's disability made by Dr. Rana, the physician who treated Lanzillo for her back pain, choosing instead to simply focus on the letter he had written to excuse her from jury duty. *See id.* 558-59, 563-65, 567-68, 571-72, 576-77, 582-83, 587-89, 592-93, 599-600. In forming his own conclusions as to the import of Dr. Rana's findings, the ALJ improperly substituted his "own assessment of the relative merits of the objective evidence and subjective complaints for that of the treating physician." *Garcia v. Barnhart*, 01-CV-8300, 2003 WL 68040, at *7 (S.D.N.Y. Jan. 7, 2003); *Balsamo*, 142 F.3d at 81 (quoting *McBrayer v. Sec. of*

*Health & Human Servs*., 712 F.2d 795, 799 (2d Cir. 1983)("[W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him.").

It also appears that the ALJ failed to consider the fact that Lanzillo was suffering from several well-documented medical conditions that would flare up at different times or that she was required to have a permanent spinal cord stimulator placed in her lower back to combat her pain in 2017.[6]  *Id.* 643-44.  By doing so, the ALJ gave little deference to Lanzillo's treating physicians who "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations."  20 C.F.R. § 404.1537(c)(2).  For this reason, , the SSA is required to explain the weight it gives to the opinions of a treating physician.  *See* 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.")  As noted above, "[f]ailure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is ground for remand."  *Snell,* 177 F.3d at 133 (citing *Schaal v. Apfel*, 134 F. 3d 496, at 505 (2d Cir. 1998).

In sum, because it is unclear whether the ALJ engaged in an adequate credibility inquiry or considered all relevant factors in determining the weight to give to the reports of Lanzillo's treating physicians, and "because application of the correct legal principles does not necessarily lead to only one conclusion, the undersigned respectfully recommends that the case be remanded to the Commissioner for further consideration."  *Reyes v. Apfel*, 98 Civ. 0644 (LBS), 1999 WL

---

[6] Lanzillo's MRI's showed that she had a sacralization of the L5 vertebral body, severe central canal stenosis and a herniated disc at the L1-2 level as well as a large disc herniation with a smaller osteophyte ridge impinging the left ventral cord at C6-7.  Tr. 21, 282-283, 640.

39538, at *4 (S.D.N.Y., Jan. 29, 1999) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) ("Because of the lack of specificity of ALJ Scott's decision and the inconclusiveness of the record, it is appropriate to remand the case to HHS in order to ensure that the correct legal principles are applied to the determination of Johnson's disability claim."); *see also Blizzard v. Barnhart*, 03-Civ-10301, 2005 WL 946728 at *13 (S.D.N.Y., April 25, 2005).[7]

## OBJECTIONS

A copy of this Report and Recommendation is being electronically served on counsel for each of the parties.  Any written objections to the Report and Recommendation must be filed with the Clerk of the Court within fourteen days of service of this report.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b).  Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court of Court of Appeals.  *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision.").

Dated: Central Islip, New York
      March 24, 2021

_____/s/_____
ARLENE R. LINDSAY
United States Magistrate Judge

[7] Berryhill argues in her cross-motion that substantial evidence supports the ALJ's finding that Lanzillo's hip bursitis was not severe.  The Court agrees.  In addition, the undersigned notes that Lanzillo has not challenged the ALJ's determination with respect to her alleged mental disability.  Accordingly, that finding should be affirmed.